## EXHIBIT A

## AFFIDAVIT OF ULLRICH C. MAYESKI

I, Ullrich C. Mayeski, being duly sworn, declare and state as follows:

### A.   INTRODUCTION

1.      I am presently employed as a Diversion Investigator with the Drug Enforcement

Administration ("DEA") and have been employed as such for approximately three and one-half

years.  As a Diversion Investigator, I conduct regulatory, civil and criminal investigations of

DEA registrants related to their controlled substances activities.  During my career as a Diversion

Investigator, I have participated in several investigations of DEA registrants relating to their

improper prescribing, dispensing and distributing of controlled substances.  I have received

training on numerous occasions relating to these types of investigations.  I am knowledgeable of

the laws, regulations and procedures pertinent to investigations of the diversion of controlled

substances to the illicit market as well as the techniques employed by registrants to divert

controlled substances.

2.      I submit this Affidavit in support of a civil complaint for forfeiture in rem against

the following:

> a.      $51.32 in United States currency seized from Bank of America Business
>         Interest Maximizer account number 0046-0217-0208, held in the name of
>         Non-Surgical Orthopedic Center, LLC; and
>
> b.      $30,478.46 in United States currency seized from Bank of America
>         checking account number 0046-0384-7433, held in the name of Non-
>         Surgical Orthopedic Center, LLC,

(collectively, the "Funds").  I submit that there is probable cause to believe that the Funds

constitute moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of 21 U.S.C. §§ 841 and/or 843, proceeds traceable to such an exchange, and/or moneys, negotiable instruments, or securities used or intended to be used to facilitate a violation of 21 U.S.C. §§ 841 and/or 843, and therefore the Funds are subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6). There also is probable cause to believe that the Funds constitute or are derived from proceeds traceable to health care fraud in violation of 18 U.S.C. § 1347, and therefore the Funds are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C). In addition, there is probable cause to believe that the Funds constitute property involved in money laundering transactions or attempted money laundering transactions in violation of 18 U.S.C. § 1956, or property traceable to such property, and therefore the Funds are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

3.     As set forth below, the investigation described herein revealed that Joseph Zolot, M.D. ("Zolot"),  who practiced until June 2007 at the Non-Surgical Orthopedic Center, LLC, ("NSOC") at 140 Gould Street, Needham, MA, 02494, distributed controlled substances other than in the usual course of professional practice and not for legitimate medical purposes, in violation of 21 U.S.C. §§ 841(a)(1) and 843, and that he knowingly and willfully executed a scheme or artifice to defraud a health care benefit program or to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program in connection with the delivery of or payment for health care benefits, items, or services, in violation of 18 U.S.C. § 1347.

4.     I have personally participated in this investigation since September 2005. I am familiar with the facts and circumstances of this investigation from oral and written reports made

2

to me by other law enforcement officers including the Drug Enforcement Administration

("DEA"), Federal Bureau of Investigation ("FBI"), Internal Revenue Service, Criminal

Investigation ("IRS-CI"), Health and Human Services ("HHS"), Massachusetts State Police

("MSP"), Boston Police Department ("BPD"), Norfolk County Police Anti-Crime Unit

("NORPAC") and Needham Police Department ("NPD"), and by the Enforcement Division of

the Board of Registration in Medicine for the Commonwealth of Massachusetts; oral and written

reports of interviews and meetings with undercover agents and confidential informants; review of

prescription records relating to the subjects identified in this Affidavit; review of evidence

obtained during the execution of a federal search warrant in May 2007; and from my own

personal participation in the investigation, which includes surveillance and independent

investigation.  Since this affidavit is submitted for the limited purpose of establishing probable

cause for forfeiture of the Funds, I have not included every fact known to me or other law

enforcement officers concerning this investigation.

## B.   RELEVANT STATUTES

5.     21 U.S.C. § 841(a)(1) makes it a federal offense for any person, except as

authorized by the Controlled Substances Act, to knowingly or intentionally manufacture,

distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled

substance.  Prescriptions that are issued for illegitimate non-medical purposes by a practitioner

acting outside the usual course of his professional practice, if knowingly and intentionally made,

may form the basis for criminal liability under 21 U.S.C. § 841.

6.     21 U.S.C. § 843(a)(3) makes it a federal offense for any person to acquire or

obtain possession of a controlled substance by fraud.  Section 843(a)(4)(a) makes it a federal

offense for any person to furnish false or fraudulent material information, or omit any material

3

information from, any application, report, record, or other document required to be made, kept, or filed.

7.      18 U.S.C. § 1347 makes it a federal offense for any person to knowingly and willfully execute a scheme or artifice to defraud a health care benefit program or to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program in connection with the  the delivery of or payment for health care benefits, items, or services.  A "health care benefit program," as that term is used in 18 U.S.C. § 1347, is defined in 18 U.S.C. § 24(b) to be "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual...."  As such it includes the Medicare and Medicaid programs as well as any health insurance plans such as BlueCross/Blue Shield.  If there is no medical necessity for an office visit or if no reasonable and necessary medical services are provided, but the office visit is instead merely used as an opportunity to illegally prescribe narcotics, then any billing submitted to a health care benefit program as a result of the visit is fraudulent.

8.      18 U.S.C. § 1956(a)(1)(A)(i) makes it a crime to conduct or attempt to conduct a financial transaction, knowing that the property involved in the transaction represents the proceeds of some form of unlawful activity, with the intent to promote the carrying on of specified unlawful activity.  Violations of 21 U.S.C. §§ 841 and 843, and violations of 18 U.S.C. § 1347, constitute "specified unlawful activity" as that term is defined in 18 U.S.C. § 1956(c)(7).

9.      21 U.S.C. § 881(a)(6) provides that the following shall be subject to fofeiture to the United States, and no property right shall exist in them: "All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in

exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter."

10.      Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a money laundering transaction or attempted money laundering transaction in violation of 18 U.S.C. § 1956, or any property traceable to such property, is subject to forfeiture to the United States.

11.      Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to an offense constituting a specified unlawful activity under 18 U.S.C. § 1956(c)(7) is forfeitable to the United States.  As set forth above, violations of 18 U.S.C. § 1347, constitute "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7).

## C.      BACKGROUND

### 1.      Schedules of Controlled Substances

12.      The Comprehensive Drug Abuse Prevention and Control Act of 1970 established a classification system for prescription medications based upon the potential for abuse, the danger and the medicinal value of the drugs.  See 21 U.S.C. § 812.  Five drug schedules were developed for the purpose of classifying drugs based on these characteristics.  Upon being placed into one of these drug schedules, a drug is henceforth considered a "controlled substance."  Schedule I controlled substances have a high potential for abuse and have no currently accepted medical use in the United States.  Schedule II controlled substances have a high potential for abuse, but also have a currently accepted medical use in treatment in the United States.  If abused, Schedule II drugs can lead to severe psychological or physical dependence.  Drugs placed

into Schedules III through V have an accepted medical use and those in the higher numbered Schedules have progressively less potential for abuse and risk of physical or psychological dependence than those in the lower numbered Schedules.

13.     Based on my training and experience, I am aware that controlled substances in Schedules II – V are often abused. OxyContin, for example, which is a Schedule II narcotic drug used for pain relief, is the recreational drug of choice for many prescription drug abusers. The Food and Drug Administration ("FDA") approved OxyContin as a prescription drug in 1996. The controlled substance in OxyContin is oxycodone hydrochloride. OxyContin was originally formulated as a time-release pain reliever intended for a single dose to deliver pain relief for 12 hours. Crushing OxyContin, however, destroys its time-release properties. Addicts often crush the pills and inject a solution of the crushed pills and water into their bloodstream. The pills can also be chewed or snorted, once crushed, to obtain an immediate high. OxyContin is manufactured in 10, 20, 40 and 80 milligram pills. There is an active illegal trade in OxyContin; in small quantities, OxyContin typically sells on the street for $1.00 per milligram of oxycodone. So a single 80-mg OxyContin pill may sell for $80.00.

14.     Oxycodone combination products such as Percocet, Roxicet and Endocet are also frequently diverted to illegal sale and use. They contain both oxycodone hydrochloride and acetaminophen. These products are available in a variety of strengths and concentrations of the oxycodone to acetaminophen ratio. Oxycodone strengths in these combinations include 2.5, 5, 7.5 and 10 milligram pills. Street values of these pills range from $7.00 to $10.00 per pill; although not as highly sought after as OxyContin by drug abusers, there is an active illegal trade in these drugs as well.

15.     Methadone hydrochloride ("methadone") is an opioid analgesic Schedule II

6

synthetic narcotic drug.  It is used to treat addiction to narcotics and to relieve severe pain, often in individuals who have cancer or terminal illnesses.  When prescribed by physicians for pain relief, methadone is prescribed in 5, 10, or 40 milligram tablets.  The street value of the tablets ranges from $15.00 to $17.00 per tablet.

16.     Fentanyl is a potent synthetic opioid Schedule II controlled substance.  It is 100 times more potent than morphine as an analgesic and 50 times more potent than heroin by weight.  Fentanyl is currently available in the dosage forms of oral lozenges, commonly referred to as "lollipops" ("Actiq"), transdermal patches ("Duragesic"), and injectable formulations.  The manufacturer's approved labeling states that the lozenges are indicated only for the management of breakthrough cancer pain in patients with malignancies who are already receiving, and are tolerant to, opioid therapy for their underlying consistent cancer pain.  Transdermal patches are used in the management of chronic pain in patients who require continuous opioid analgesia for pain.  According to the manufacturer's approved labeling , Duragesic is indicated for management of persistent, moderate to severe chronic pain that requires continuous, around-the-clock opioid administration for an extended period of time, which cannot be managed by other means such as non-steroidal analgesics, opioid combination products, or immediate-release opioids.  The manufacturer's approved labeling further states that the high content of fentanyl in the patches may be a particular target for abuse and diversion.

## 2.    The Medicare Program

17.     The Medicare program is a federally subsidized health insurance program for the elderly and for persons with certain disabilities pursuant to Title XVIII of the Social Security Act. The program is administered by the Centers for Medicare and Medicaid Services ("CMS") of the U.S. Department of Health and Human Services, and private contractors or carriers.

18.     Medicare Part A (hospital insurance) helps cover in-patient care in hospitals, including critical access hospitals, and skilled nursing facilities (not custodial or long-term care). It also helps cover hospice care and some home health care. Certain conditions must be met to get these benefits. Most people do not pay a premium for Part A because they or a spouse already paid for it through their payroll taxes while working.

19.     Medicare Part B (medical insurance) helps cover doctors' services and out-patient care. It also covers some other medical services that Part A does not cover, such as some of the services of physical and occupational therapists, and some home health care. Part B helps pay for these covered services and supplies when they are medically necessary. Most people pay a monthly premium for Part B. The National Heritage Insurance Company in Hingham, MA, is the Medicare carrier which pays Part B claims in Massachusetts.

20.     To bill the Medicare program, healthcare providers or suppliers apply for a Medicare billing or PIN number. A group of providers, such as a physician's practice or a physical therapy clinic, can get a group provider number to bill Medicare. Individual providers, such as doctors and physical therapists, can also get their own individual provider number. Medicare records show that Zolot had an individual provider number, which he uses to bill Medicare and other programs.

21.     Each provider must sign a participation agreement in order to become a certified Medicare provider. Upon acceptance as a provider, the participant is issued a manual outlining participation requirements and guidelines. To receive Medicare reimbursement for covered services set forth in the manual, the provider fills out either a UB-92 Claim Form for Part A, or a Health Insurance Claim Form (HCFA-1500) for Part B. These forms are either mailed or electronically submitted to the Medicare program's fiscal intermediary. When a provider

submits a claim to Medicare, it includes information such as the beneficiary's name and address, Medicare number, the date and type of service provided, the place of service, the procedure code, diagnosis code, amount billed and other relevant medical information. One of the critical conditions for any payment is that the service has been provided for a legitimate, medically necessary purpose; the provider certifies as to this condition for each and every claim submitted.

### 3.   Private Insurance Companies

22.     Blue Cross/Blue Shield ("BC/BS") is one of the largest managed health care companies operating in Massachusetts. BC/BS provides health insurance plans which cover, among other things, hospital, physician, prescription drug and other medical services provided to policy holders. BC/BS subcontracts the processing of prescriptions to Express Scripts, Inc., located in Bensalem, PA.

23.     When a provider submits a claim to BC/BS, the claim includes information such as the insured's name and address, identification number, the date and type of service provided, the place of service, the Current Procedural Terminology ("CPT") procedure code, diagnosis code, the amount billed, and other information. The claim is either electronically submitted or mailed to BC/BS in Boston, MA. The claim is then reviewed, processed, and if approved, paid to the provider by mail or, in certain circumstances, through wire transfer. Normally with pharmacy claims, the participating pharmacy electronically submits the claim to Express Scripts in Pennsylvania. Express Scripts reviews, processes, and if approved, pays the pharmacy. Express Scripts is reimbursed by BC/BS.

### 4.   The Physician-Patient Relationship

24.     At the core of both the prescription of controlled substances as well as the provision of reimbursable medical services is the physician-patient relationship. The physician-

9

patient relationship arises when the patient comes to the physician for the purpose of obtaining treatment for an illness or condition. The physician typically performs an examination and/or conducts some rudimentary questioning with respect to the patient's medical health, condition and history. From that interaction, there must be a reasonable nexus between the patient's legitimate medical needs and the prescribing of medication to the patient.

25.     No controlled substance may be properly dispensed by a pharmacist under the Controlled Substances Act, 21 U.S.C. §§ 841 *et seq.*, unless it is pursuant to a prescription written by a registrant (doctor, physician's assistant, or nurse practitioner, generally) *in the normal course of valid medical treatment.* Nor may any medical service be properly billed to a health care benefits program, such as Medicare or BC/BS, if it is not medically necessary.

26.     Extensive evidence gathered during the course of this investigation establishes that Zolot did not have legitimate physician-patient relationships with a significant number of his patients. Examples of such illegitimate physician-patient relationships are set forth in the Affidavit of Philip Beattie, Jr., Enforcement Division, Massachusetts Board of Registration in Medicine (the "Board of Registration"), which is attached at Tab 1 and incorporated herein by reference.

### 5.   Absence of a Legitimate Physician-Patient Relationship

27.     A number of criteria indicate the absence of a valid doctor-patient relationship. These include: a physician who prescribes a large amount of controlled substances per prescription in comparison to his peer group; a physician who issues significantly large numbers of prescriptions on either a per capita basis or in comparison to his peer group; a physician who conducts no physical examination or a highly abbreviated examination; a physician who takes no medical history or an inappropriately abbreviated history; a physician who routinely sees patients

for 10 minutes or less; a physician who advises patients to fill the prescriptions at different pharmacies; a physician who prescribes controlled substances at intervals inconsistent with legitimate medical treatment; a physician who uses street slang rather than medical terminology for the drug prescribed; an absence of a logical relationship between the drugs prescribed and the treatment of the claimed existing condition; a physician who writes more than one prescription for the same medicine on the same date in order to spread them out.

28.     Controlled substances must be prescribed for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.  An order purporting to be a prescription but which is not issued in the usual course of professional treatment is not a valid prescription.

### D.   ZOLOT

29.     According to the Board of Registration, Zolot graduated from Leningrad Pediatric Medical Institute in 1974 with a medical degree, and has been licensed to practice medicine in Massachusetts since 1993.  Zolot's license to practice medicine in Massachusetts was suspended in June 2007.  Zolot was board certified in Physical Medicine and Rehabilitation.  Zolot has a DEA practitioner's registration, and was authorized to prescribe controlled substances in Schedules II – V until his license to practice medicine was suspended in June 2007.

30.     Zolot is the sole owner of the Non-Surgical Orthopedic Center, LLC, ("NSOC") located at 140 Gould Street, Needham, Massachusetts.  NSOC was incorporated in the Commonwealth of Massachusetts on August 1, 2006.  According to state registration records, Zolot is the Manager of NSOC and no other individuals are named as officers or managers of the corporation.  Prior to August 1, 2006, Zolot was a self-employed individual of a sole proprietorship doing business under the NSOC name.

11

31.    Lisa Pliner, N.P. ("Pliner") is a Nurse Practitioner who had been practicing full-time in Zolot's office at the NSOC since 2004.  Pliner was licensed by the Board of Registration in Nursing on July 2, 1996, and she passed the examination required by Massachusetts regulations for a nurse acting in the expanded role of a nurse practitioner.  See 244 C.M.R. § 4.13(2)(b).  Pliner had a DEA mid-level practitioner's registration, as described at 21 C.F.R. § 1300.01(b)(28), which authorized her to prescribe controlled substances in Schedules II – V.  In the Commonwealth of Massachusetts, a nurse practitioner must work under the supervision of a physician.  Pliner worked under the supervision of Zolot, who was ultimately responsible for her practices.

32.    In May 2007, NSOC's website stated that NSOC opened for business in 2002.  The website indicated that Zolot immigrated to the United States from Russia in 1988 and has had his own practice since 1995.  According to the website, NSOC adhered to "an active but strictly non-invasive approach in dealing with the most painful of and debilitating orthopedic maladies."  As stated in the website, Zolot's "integrative non-invasive approach is safer and it works!" and NSOC's motto is "Let's help the patient to start feeling better today!"  The website further states that "all health insurances (except Mass Health and BC/BS) are accepted."

33.    The investigation revealed, however, that Zolot had been prescribing Schedule II – V controlled substances without a legitimate medical purpose and outside the scope of professional practice.  These controlled substances included, but were not limited to:  oxycodone products such as OxyContin, Percocet, and Roxicet; hydrocodone products; fentanyl products such as Duragesic patches and Actiq lozenges; methadone products such as Methadose; morphine products such as Kadian; and benzodiazepines such as Xanax and Valium.

## E.   THE INVESTIGATION

34.   DEA initiated an investigation into the controlled substances distributing activities of Zolot and Pliner on July 20, 2005, based on information provided by the Needham Police and the Boston Police regarding reports of drug seekers entering and leaving Zolot's practice, the NSOC, in Needham, Massachusetts.  Pharmacists had placed telephone calls to these police departments, reporting that patients of Zolot and Pliner were filling unusually high numbers of prescriptions for Schedule II narcotics.  Pharmacists also reported that these prescriptions were written for unusually high milligram dosage strength of the narcotics prescribed.

35.   In my experience, pharmacists are frequently adept at detecting a customer who is likely abusing prescription drugs.  Based on filling thousands of prescriptions, pharmacists get to know patterns and behavior of customers.  Addicted customers often exhibit impatience in getting their prescriptions filled, they routinely wait for the prescriptions to be filled rather than dropping them off and they are frequently agitated or become agitated if they are asked any questions regarding their identity, their medical condition, or their doctor.  Addicted customers often pay with cash.  These factors are not an exhaustive list, nor would any one factor be conclusive; however, pharmacists have the experience and are in a position to evaluate many factors in reaching a conclusion that a customer is seeking narcotics for addiction rather than to treat a medical condition.

36.   In addition to pharmacists contacting the Needham and Boston police departments regarding Zolot and Pliner, a pharmacist working for CVS Pharmacy in Quincy, Massachusetts (CW-1) provided unsolicited information to DEA that drug seekers were entering CW-1's pharmacy with prescriptions written by Zolot and/or Pliner.

37.   DEA also received unsolicited information from a practitioner (CW-2) at the

13

South Boston Community Health Center in South Boston, Massachusetts.  CW-2 first contacted

DEA in May 2004 to voice concerns regarding the prescribing habits of Zolot based on several

mutual patients that CW-2 shared with Zolot.  Specifically, in March 2004, CW-2 informed DEA

that CW-2 felt strongly that several of CW-2's patients were Percocet abusers who had been

prescribed the drug inappropriately by Zolot.  CW-2 stated that CW-2's patients related to him

that Zolot's reputation on the street was that he is a "writer for lots of narcotics" and that many

patients pay cash for office visits and/or toxicology screens in order to see Zolot  even if they

lack insurance coverage.  CW-2 told DEA, for example, that CW-2 learned that Zolot treats "lots

of Workmen's Compensation patients" and usually sees patients for cash.  CW-2 further advised

that some Zolot patients even paid cash for toxicology screens, which are generally covered by

insurance.

     38.     CW-2 contacted DEA again during April 2005 to report information that CW-2

had learned regarding one of CW-2's, who had died.  CW-2 stated that bottles of Percocet and

methadone prescribed by Zolot were found at the scene of the patient's death.  A subsequent call

to DEA by the decedent's father indicated that the Medical Examiners Report from the patient's

autopsy listed methadone intoxication as a contributing factor to the patient's death.

     39.     During the course of this investigation, law enforcement officers also learned that

in May 2006, BC/BS stopped paying for office visits conducted by Zolot and Pliner.  BC/BS

suspended its agreements with Zolot based on a determination that ZOLOT's care of BC/BS

patients was substantially below legitimate standards of care.  Specifically, as stated in a Board of

Registration Health Care Facility Disciplinary Action Initial Report dated May 22, 2006, on May

15, 2006, an indefinite suspension of participating agreements [with BC/BS] was taken for the

following reason:

14

> The Blue Cross and Blue Shield of Massachusetts, Inc.
> and Blue Cross Blue Shield of Massachusetts HMO Blue, Inc.
> (collectively, "Blue Cross") Medical Peer Review Committee
> ("the Committee"), which acts as a peer review body, acted to
> suspend Dr. Zolot's participation in the Blue Cross indemnity
> and managed care products, including the Medicare Advantage
> products, effective immediately.  This decision was based on the
> Committee's findings that, with respect to his prescribing of
> narcotics,Dr. Zolot failed to adequately evaluate, document, and
> manage the care of Blue Cross members, which creates imminent
> risk of harm to their health.

40.     The investigation showed that insurers were billed for services allegedly rendered

by Zolot and Pliner, including office visits resulting in the issuance of prescriptions for Schedule

II controlled substances.  As detailed below, the financial investigation showed significant

deposits of funds from insurance providers into NSOC business accounts.

41.     The investigation also showed that Zolot submitted bills to BC/BS for services

allegedly rendered to BC/BS members, which ultimately led to an internal investigation by

BC/BS concerning Zolot's standard of care in treating its members.  As detailed above, BC/BS

ultimately suspended Zolot's participation in the BC/BS indemnity and managed care products

because it found that "with respect to his prescribing of narcotics, Dr. Zolot failed to adequately

evaluate, document, and manage the care of Blue [C]ross members, which creates imminent risk

of harm to their health."

42.     Attached at Tab 1 and incorporated by reference is the Affidavit of Philip Beattie

(the "Beattie Affidavit"), submitted on June 20, 2007 to the Board of Registration in support of a

Motion for Summary Suspension of Zolot's medical license.  On June 20, 2007, Board of

Registration issued an Order of Temporary Suspension, suspending Zolot's license.  As set forth

in Paragraph 1 of the affidavit, Beattie is an investigator with the Enforcement Division of the

Board of Registration.  In January 2007, Beattie was assigned to investigate Zolot as the result of

concerns about his prescribing practices.

43.     I have reviewed the Beattie Affidavit.  The Exhibits referred to in the Beattie

Affidavit are under order of impoundment, and I have not reviewed the actual Exhibits.

However, based on the description of the Exhibits in the Beattie Affidavit, I believe that I have

reviewed the following exhibits during the course of this investigation:

- Exhibit 1 (April 19, 2007 advertisement from the Needham Times);

- Exhibit 2A (Health Care Disciplinary Action Report filed by BC/BS with the Massachusetts Board of Registration in Medicine);

- Exhibit 2B (Decision Summary of the Special Medical Peer Review Committee Meeting, summarizing meeting between Zolot and BC/BC Medical Peer Review Committee);

- Exhibit 3 (expert physician review obtained by HHS-OIG);

- Exhibit 4 (Board Expert's Chart Review Final Report);

- Exhibit 32 (Boston Police Department reports regarding undercover operation);

- Exhibit 63 (Massachusetts State Police report regarding death of Patient Z);

- Exhibits 39, 48, 55, 60, 66, 69 (Post Mortem Examination Reports); and

- Exhibit 74 (Massachusetts EDT Program Prescriber Ranking Report for calendar year 2006).

I have not reviewed the exhibits to the Beattie Affidavit not specifically listed above.  However,

according to the affidavit those exhibits include the medical records of thirty (30) of Zolot's

patients (Exhibits 5, 7, 9, 11, 13, 15, 17, 20, 22, 24, 26, 28, 30, 33, 35, 37, 40, 42, 44, 46, 49, 51,

53, 56, 58, 61, 64, 67, 70, and 72), referred to in the Beattie Affidavit as Patients A through DD.

Those records were recovered during the execution of a federal search warrant at Zolot's office in

May 2007.  I have reviewed those medical records, and while I have not matched each patient

16

name with the patient letter used in the Beattie Affidavit, I am familiar with the medical records for the thirty (30) specific patients upon which the Beattie Affidavit is based.

44.     As set forth in more detail in the Beattie Affidavit, Zolot and Pliner prescribed Schedule II – V controlled substances without a legitimate medical purpose and outside the scope of professional practice between 2002 and May 2007. These controlled substances included, but were not limited to: oxycodone products such as OxyContin, Percocet, and Roxicet; hydrocodone products; fentanyl products such as Duragesic patches and Actiq lozenges; methadone products such as Methadose; morphine products such as Kadian; and benzodiazepines such as Xanax and Valium.

45.     Based on the foregoing, and on the information set forth in the Beattie Affidavit, I submit that there is probable cause to believe that, beginning at least as early as 2005 and continuing until May 2007, Zolot has (i) distributed controlled substances outside the usual course of professional practice and without a legitimate medical purpose in violation of 21 U.S.C. §§ 841 and  843, and (ii) knowingly and willfully executed a scheme or artifice to defraud a health care benefit program or to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program in connection with the delivery of or payment for health care benefits, items, or services, in violation of 18 U.S.C. § 1347.

### F.   FORFEITABILITY OF THE FUNDS

46.     Based on my training and experience, I am aware that one indicia of potential drug diversion is patients who pay cash for office visits. Typically, in a legitimate medical practice, most patients have some type of insurance, either private insurance such as Blue Cross/Blue Shield, or public insurance such as Medicaid or Medicare. Where a patient is primarily seeking

17

prescription narcotics because s/he is addicted, the patient will frequently use insurance to pay for only one of several office visits in a month so that the insurer cannot track the subsequent office visits. Such patients may also see multiple doctors without any of the doctors knowing that the patient is also seeing other doctors and obtaining narcotics prescriptions from these other physicians. Cash is paid for the additional office visits not only to prevent tracking of the multiple visits but also because the patient knows that the insurer will not pay for office visits which occur frequently without adequate justification.

47.     As set forth above and in the Beattie Affidavit, BC/BS stopped paying for office visits to Zolot and Pliner in May 2006, and subsequently patients with BC/BS paid for their visits in cash, as opposed to finding another doctor who would accept their BC/BS insurance.

### a.     $51.32 seized from Bank of America Business Interest Maximizer Account Number 0046-0217-0208

48.     Bank of America checking account number 002-7353-7559 (the "7559 Account"), was one of three business accounts Zolot opened with Fira Dabuzhsky at Bank of America. The investigation revealed that Zolot used to work with Dr. Leonid Dabuzhsky. Investigators suspect that Fira Dabuzhsky was related to Dr. Dabuzhsky and did some administrative work at the medical practice, including dealing with these bank accounts.

49.     Bank records revealed that the 7559 Account was opened in March of 1995. The statements described each deposit as either an ATM deposit, deposit, credit card deposit (referred to as "Global Payments"), or electronic funds transfer. Global Payments networks process billions of business and consumer payment card and money transfer transactions annually for customers in the United States, Canada, Europe, and Latin America.

50.     Between January 2005 and December 2005, $2,285,912.16 was deposited into the

7559 Account. The total deposits were comprised of cash ($239,967), funds from insurance providers and law offices for patient visits ($1,741,410.48), third party checks which appear to be from patients ($20,461.20), and Global Payments deposits ($45,591.01). During the same time period, payments made from the 7559 Account included credit card payments ($72,931.35), payroll for NSOC ($210,540.44), medical supplies ($190,251.96), medical billing ($147,455.74), insurance companies ($7,172.13), tax payments ($267,990.10), lease expenses ($71,573.33), and payments to Zolot ($30,000).

51.     Between January 2006 and July 2006, $1,577,885.45 was deposited into the 7559 Account. Those deposits included cash ($150,553), funds from insurance providers and payments from law firms for patient visits ($1,006,412.67), third party checks which appear to be from patients ($11,635.62), and Global Payments deposits ($64,595.65). During the same time period, payments from the 7559 Account included credit card payments ($13,950.45), payroll ($70,834.57), medical supplies ($210,226.35), medical billing ($85,694.35), payments to insurance companies ($33,672.80), tax payments ($414,901.09), lease expenses ($77,662.27), and office expenses ($13,352.78).

52.     On August 8, 2006, Business Interest Maximizer account number 0046-0217-0208 (the "0208 Account") was opened in the name of Non-Surgical Orthopedic Center, LLC. Also on August 8, 2006, $10,000 was transferred into the 0208 Account from the 7559 Account. As of May 2007, there had been no other deposits into the 0208 Account, except for monthly interest payments. On May 15, 2007, this Court (Hillman, M.J.), finding probable cause for forfeiture, issued a federal seizure warrant for all funds on deposit in the 0208 Account. On or about May 17, 2007, agents executing the seizure warrant seized $51.32, the total funds on deposit in the 0208 Account at the time of the seizure.

53.     Based on the foregoing, there is probable cause to believe that at least a portion of the cash, insurance, check and Global Deposit credits to the 7559 Account between January 2005 and July 2006, and certainly more than $52.31 in United States currency, constituted proceeds traceable to Zolot's violations of 21 U.S.C. §§ 841 and 843.  There further is probable cause to believe that at least a portion of the insurance payments deposited into the 7559 Account between January 2005 and July 2006, and certainly more than $52.31 in United States currency, constituted proceeds traceable to Zolot's violations of 18 U.S.C. § 1347.  Accordingly, there is probable cause to believe that the $52.31 in United States currency seized from the 0208 Account on or about May 17, 2007 constituted property traceable to proceeds of violations of 21 U.S.C. §§ 841 and 843, and 18 U.S.C. § 1347, and therefore is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(7) and 18 U.S.C. § 981(a)(1)(C).

54.     In addition, there is probable cause to believe that the deposits of proceeds traceable to Zolot's violations of 21 U.S.C. §§ 841 and 843 and 18 U.S.C. § 1347 into the 7559 Account, and the payments of expenses related to the business from the 7559 Account, constituted financial transactions involving the proceeds of a specified unlawful activity (21 U.S.C. §§ 841 and 843, and 18 U.S.C. § 1347) conducted with the intent to promote the carrying on of a specified unlawful activity in violation of 18 U.S.C. § 1956(a)(1)(A)(i).  Accordingly, there is probable cause to believe that the 7559 Account constituted property involved in money laundering transactions in violation of 18 U.S.C. § 1956, and that the 0208 Account constituted property traceable to such property.  Accordingly, the $51.32 in United States currency seized from the 0208 Account is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

### b.   $30,478.46 Seized From Bank of America
### Checking Account Number 0046-0384-7433

55.     In August 2006, Zolot opened Bank of America checking account number 0046-0384-7433 (the "7433 Account) in the name of "Non-Surgical Orthopedic Center LLC." Zolot was the only authorized signer on the 7433 Account. All of the deposits into the 7433 Account, described in more detail below, were made in the name of either NSOC or Zolot.

56.     Between August 2006 and December 2006, $700,517.26 was deposited into the 7433 Account. The deposits included cash ($126,132), payments from insurance companies and law firms for patient visits ($426,518.69), third party checks which appear to be from patients ($5,844.51), and Global Payments deposits ($33,969.70). On August 8, 2006, $20,000.00 was transferred from the 7559 Account to the 7433 Account, and on September 12, 2006, $80,000.00 was transferred from the 7559 Account to the 7433 Account.

57.     During the same time period, payments from the 7433 Account included payroll ($114,824.74), medical supplies ($48,730.04), medical billing ($41,721.69), insurance companies ($37,171.03), tax payments ($156,114.70), lease expenses ($51,144.10), and office expenses ($33,892.02). On May 15, 2007, this Court (Hillman, M.J.), finding probable cause for forfeiture, issued a federal seizure warrant for all funds on deposit in the 7433 Account. On or about May 17, 2007, agents executing the seizure warrant seized $30,478.46, the total funds on deposit in the 7433 Account at the time of the seizure.

58.     Based on the foregoing, there is probable cause to believe that at least a portion of the cash, insurance, check and Global Deposit credits to the 7433 Account between August and December 2006 constituted proceeds traceable to Zolot's violations of 21 U.S.C. §§ 841 and 843. The cash deposits alone into the 7433 Account during that time period totaled $126,132.    There

further is probable cause to believe that at least a portion of the insurance payments deposited into the 7433 Account between August 2006 and December 2006 – which totaled $37,171.03 – constituted proceeds traceable to Zolot's violations of 18 U.S.C. § 1347. Because the seizure warrant was executed within one year of these deposits, and because the subject of the seizure was funds deposited in a bank account, it is not necessary for the Government to identify the specific property involved in the offense that is the basis for forfeiture, pursuant to 18 U.S.C. § 984(a)(1)(A). Accordingly, there is probable cause to believe that the $30,478.46 seized from the 7433 Account on or about May 17, 2007 constituted property traceable to proceeds of violations of 21 U.S.C. §§ 841 and 843, and 18 U.S.C. § 1347, and therefore is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(7) and 18 U.S.C. § 981(a)(1)(C).

59.     In addition, there is probable cause to believe that the deposits of proceeds traceable to Zolot's violations of 21 U.S.C. §§ 841 and 843 and 18 U.S.C. § 1347 into the 7433 Account, and the payments of expenses related to the business from the 7433 Account, constituted financial transactions involving the proceeds of a specified unlawful activity (21 U.S.C. §§ 841 and 843, and 18 U.S.C. § 1347) conducted with the intent to promote the carrying on of a specified unlawful activity in violation of 18 U.S.C. § 1956(a)(1)(A)(i). Accordingly, there is probable cause to believe that the 7433 Account constituted property involved in money laundering transactions in violation of 18 U.S.C. § 1956. Accordingly, the $30,478.46 in United States currency seized from the 7433 Account is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## CONCLUSION

60.    Based on the foregoing information, I submit that there is probable cause to believe that the Funds constitute moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of 21 U.S.C. §§ 841 and/or 843, proceeds traceable to such an exchange, and/or moneys, negotiable instruments, or securities used or intended to be used to facilitate a violation of 21 U.S.C. §§ 841 and/or 843, and therefore the Funds are subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6). There also is probable cause to believe that the Funds constitute or are derived from proceeds traceable to health care fraud in violation of 18 U.S.C. § 1347, and therefore the Funds are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C). In addition, there is probable cause to believe that the Funds constitute property involved in  money laundering transactions or attempted money laundering transactions in violation of 18 U.S.C. § 1956, or property traceable to such property, and therefore the Funds are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

Signed under the penalties of perjury on the 10th day of December 2007.

Ullrich C. Mayeski
Diversion Investigator
Drug Enforcement Administration

23